Eastern District of Kentucky
**FILED**

APR 2 7 2006

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

CIVIL ACTION NO. 2004-262 (WOB)

STEVEN E. BYRNE                                      PLAINTIFF

VS.                          OPINION AND ORDER

THE BLACK & DECKER
CORPORATION, ET AL                                   DEFENDANTS

        This is a patent infringement case presently before the
court on defendants' motions for summary judgment (Doc. #15,
#22).

        The court heard oral argument on these motions on Friday,
April 14, 2006.  Phil Taliaferro, Alice Keys, Andrew Blatt, and
David Stallard represented the plaintiff.  Raymond Niro, Jr.,
Christopher Laney, and David Sloan represented the defendants.
Also present were plaintiff Steven Byrne; John DelPonti and John
Yun of Black & Decker; and Rob Craig, observer.  Court reporter
LaCartha Pate recorded the proceedings.

        Having heard the parties, the court now issues the following
opinion and order.

***FACTUAL AND PROCEDURAL BACKGROUND***[1]

**A.   The '815 and '126 Patents**

In 1989, plaintiff Steven Byrne ("Byrne") was operating a landscaping company that maintained the lawns of apartment complexes and condominiums. After a client complained about the appearance of edging work that had been done with string trimmers, Byrne recognized that a guide was needed to indicate where the string was cutting and to force the string flail to remain in a narrow range near the guide. Seeing the lid of an electric wok at home, Byrne thought that such a shape could perform the desired guide function. He mounted a wok lid on the shaft of a string trimmer and concluded that it did function to keep the string flail in a narrow range and provide a straight cut.

Byrne filed his first patent application on his string guide in December 1990, resulting in the issue of U.S. Patent No. 5,115,870 ("the '870 patent") in May 1992. Byrne first sold a product having this design in 1993-1994. In December 1992, Byrne filed a reissue application seeking to modify the claims of the 870 patent. That application resulted in the issuance to Byrne of United States Letters Reissue Patent No. 34,815, entitled "Flexible Flail Trimmer with Combined Guide and Guard" ("the '815 patent"),

---

[1]Defendants' first motion for summary judgment is based on a laches defense; its second rests on noninfringement. Because the court finds no infringement as a matter of law, it will not address the laches motion or include here facts relevant only to that defense.

on January 3, 1995.

The Abstract for the '815 patent (Complaint, Exh. 1) describes the device as: "A flexible flail trimmer for conventional trimming of grass, weeds and the like and for edging of sidewalks has a combined guide and guard rotably mounted inboard of the trimmer cutting head."  The '815 patent contains thirty-four claims.

In early 1993, Byrne determined that a guide could be used that had only a partial surface with a sloped entrance and exit to guide the string flail.  Byrne filed a patent application to cover that guide in February 1993, resulting in the issuance of United States Letters Patent No. 5,423,126, entitled "Flexible Flail Trimmer" ("the '126 patent"), on June 13, 1995.

The Abstract of the '126 patent describes its subject matter as a "flexible flail trimmer for conventional trimming of grass, weeds and other vegetation and for edging of sidewalks includes a rotatable combined guide and guard having a depth gage for providing positive vertical indexing during an edging operation." The '126 patent contains nineteen claims.  Byrne sold guides encompassing the subject matter of the '126 patent under the names "Edgit" and "Edgit Pro."

B.  **Correspondence Between Byrne and Black & Decker**

By letter dated September 14, 1993, Byrne wrote to Black & Decker offering it an opportunity to license his recently-issued '870 patent.  He sent with the letter a prototype of his

3

guide/guard as well as a home video of the device in use.

In July 1994, Black & Decker wrote to Byrne:

Your "Flexible Flail Trimmer with Combined Guide and Guard" has been discussed and evaluated by our Technical and Marketing people.

The concept described to us does not lie within our field of interest for either purchase of the idea or for any license agreement.

Byrne again contacted Black & Decker in May 1995 regarding his '815 and '126 patents, offering the technology for licensing or purchase.  Black & Decker did not respond to that letter.   Black & Decker formally introduced the first of its accused string trimmer products in late 1995, and two more models were introduced in 1996.  By 1998, the product line comprised nine models with sales in the hundreds of thousands of units.  The company sells these products nationwide in retail stores such as Home Depot, Lowes, and Wal-Mart.

## C.   <u>Byrne Accuses Black & Decker of Infringement</u>

Byrne states that he first became aware of Black & Decker's alleged infringement of his patents in June 2003, when he was in a Sears store.  He states that his attention was drawn to a display of Craftsmen battery-powered electric trimmers which, he noticed, had a large wheel that served as a guide that was very similar to his Edgit Pro product.  Byrne then went to the trimmer display in another area of the store where he saw Black & Decker string trimmers having a wire edging guide.  Upon seeing these products,

4

Byrne formed the belief that they infringed his patents.

By letter dated September 2, 2003, Byrne's attorney wrote to Black & Decker regarding the relation between Byrne's patents and the company's string trimmers, inquiring about a possible licensing arrangement. Byrne and his attorney then met with Black & Decker's counsel in April 2004, but they were unable to reach any agreement.

Byrne filed this action on December 30, 2004, alleging that Black & Decker is infringing both the '815 patent and the '126 patent through its manufacture and sale of thirteen models of string trimmers and edgers[2], including those marketed under the name "Grass Hog."

On March 4, 2005, Black & Decker answered the complaint and filed counterclaims against Byrne seeking declaratory judgments of noninfringement and patent invalidity.[3]

### ANALYSIS

Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted). "Summary judgment of noninfringement is appropriate where the patent owner's proof is

---

[2]The model numbers of these products are: ST 3000, ST 4000, ST 5000, ST 6000, ST 7000, ST 8000, ST 9000, CST 1000, CST 2000, GH 600, NST 6500, and NST 2018.

[3]Black & Decker does not assert invalidity in its present motions.

deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial." *Id.*

The court finds summary judgment in defendants' favor to be appropriate here because, as explained below, the undisputed material facts show that defendants' accused products do not infringe plaintiff's patents as a matter of law.

**A.  Claim Construction**

An infringement analysis entails two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The first step is determining the meaning and scope of the patent claims asserted to be infringed. *Id.* (citation omitted). This process is known as claim construction or claim interpretation. *See also Network, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("'Claim construction' is the judicial statement of what is and is not covered by the technical terms and other words of the claims.").

The second step is then to compare the properly construed claims to the device accused of infringing. *Markman*, 52 F.3d at 976. To find literal infringement, each limitation of the claim must be present in the accused device. *Telemac*, 247 F.3d at 1330. "Any deviation from the claim precludes such a finding." *Id.* (citation omitted).

Claim construction is a matter of law for the court. *Markman*,

6

52 F.3d at 979.

To determine the proper meaning of claims, the court first considers the so-called "intrinsic" evidence, i.e., the claims, the written description, and, if in evidence, the prosecution history. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1334 (Fed. Cir. 1998) (citation omitted). "Even within the intrinsic evidence, however, there is a hierarchy of analytical tools. The actual words of the claim are the controlling focus." *Id.*

The written description also is considered, "in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms." *Id.* If not, the ordinary meaning, to one skilled in the art, of the claim language controls. *Id.*

As the Federal Circuit has noted, in some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (citation omitted).

Finally, the "prosecution history is relevant because it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean." *Digital Biometrics*, 149 F.3d at 1334. *See also Phillips*, 415 F.3d at 1317 (explaining that "the

7

prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower that it would otherwise be").

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). In such circumstances, it is improper to rely on extrinsic evidence. *Id.* (citation omitted). In *Vitronics*, the Federal Circuit explained the policy supporting this rule:

> In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. <u>In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention.</u> . . . Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

*Id.*

### B.   The '815 Patent

Plaintiff alleges that defendants' string trimmers infringe fourteen claims of the '815 patent: 24, 25, 27, 28, 30, 31, 33, 37, 38, 39, 40, 41, 42 and 43.  Nine of those claims (24, 27, 30, 33, 37, 38, 39, 40, and 42) are "independent" claims, which is to say that they do not refer to any other claims in defining their

8

limitations.    The  other  five  claims  allegedly  infringed  are
"dependent"  claims,  that  is,  they  refer  to  and  incorporate  all  the
limitations  of  other  numbered  claims,  and  contain  additional  terms
or  limitations  of  their  own.[4]

As  the  Federal  Circuit  has  explained,  "[o]ne  may  infringe  an
independent  claim  and  not  infringe  a  claim  dependent  on  that  claim.
The  reverse  is  not  true."   *Wahpeton  Canvas  Co.  v.  Frontier,  Inc.*,
870  F.2d  1546,  1552  n.  9  (Fed.  Cir.  1989).   Thus,  if  an  independent
claim  is  not  infringed,  then  any  claim  dependent  thereon  also
cannot  be  infringed.   *Id*.

Defendants  present  a  variety  of  arguments  as  to  why  their
accused  devices  do  not  infringe  the  asserted  claims  of  the  '815
patent.   However,  because  the  court  finds  that  the  accused  devices
lack  one  limitation  common  to  all  fourteen  asserted  claims,  it  need
not  reach  these  other  arguments.   *See  Ballard  Medical  Products  v.
Allegiance  Healthcare  Corp.*,  268  F.3d  1352,  1358  (Fed.  Cir.  2001)
("If  the  district  court  considers  one  issue  to  be  dispositive,  the
court  may  cut  to  the  heart  of  the  matter  and  need  not  exhaustively
discuss  all  other  issues  presented  by  the  parties.").

Each  of  the  fourteen  asserted  claims  of  the  '815  patent

---

[4]*See*  35  U.S.C.  §  112,  ¶  4  ("[A]  claim  in  dependent  form
shall  contain  a  reference  to  a  claim  previously  set  forth  and
then  specify  a  further  limitation  of  the  subject  matter  claimed.
A  claim  in  dependent  form  shall  be  construed  to  incorporate  by
reference  all  the  limitations  of  the  claim  to  which  it  refers.").

contains a limitation which describes the portion of the device which stabilizes the flexible flail as having or including "a generally planar surface."  It is apparent to the court, after review of the extensive briefing and after viewing an example of the accused device during oral argument, that such an element is not present in defendants' products.

The feature of accused devices that plaintiff alleges infringes his '815 patent is the open wire edge guide piece that extends radially from the center of the trimmer housing.  This wire piece originates on the housing and extends horizontally from both sides straight out from its mounting; each side then bends downward for a short distance; and the sides then bend outward again, meeting and terminating in a shape resembling the letter "u."  As noted, the wire piece is open at all points and most importantly so at its terminating "u"-shaped end.  It is this end section which plaintiff claims acts as the flail stabilizing "surface."[5]

Giving words their ordinary and customary meaning, the court concludes that this wire edge guide does not have a "surface" so as to bring it within the claim limitations of the '815 patent.  The dictionary definitions of "surface" include "the exterior face of an object" or "a material layer constituting such an exterior face."  *Webster's II New College Dictionary* 1109 (Rev. 2001).

---

[5]Also, the wire edge guide can be "flipped" up against the trimmer housing when the trimmer is not being used for edging.

Further, "surface" means "the outer face, outside, or exterior boundary of a thing" or "part or all of the boundary of a solid." *The Random House College Dictionary* 1322 (1st ed. 1980).

As noted, the crucial "u"-shaped portion of the wire edge guide on the accused trimmers is open, having only a void of space above, below, and within its perimeter. The wire piece has no exterior face or layer. The court concludes that this open structure simply does not constitute a "surface" as that term is commonly understood.

This construction makes sense given the flail-stabilizing purpose of plaintiff's device. An exterior boundary or the face of a solid would indeed - - as is claimed - - provide an area against which the spinning flail could "bump" or touch, thereby limiting its deviation from its rotational path and providing a more accurate edge cut. In contrast, the accused wire edge guide lacks this feature. Indeed, defendants assert that the wire edge piece on their trimmers is not intended to stabilize the flail at all, merely to serve as an edging guide.

Given this plain meaning of this claim limitation, the court concludes that further construction of the '815 claims is unnecessary, as is a *Markman* hearing. *See Ballard Medical Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001).

The court having concluded that the accused devices lack the

11

"surface" limitation of all asserted claims of the '815 patent, defendants are entitled to summary judgment thereon.[6]

C.   **The '126 Patent**

Byrne alleges that defendants' accused devices infringe only independent Claim 16 and dependent Claims 17 and 18 of the '126 patent.

Claim 16 recites:

> A flexible flail trimmers apparatus comprising:
> a flexible flail carried by said apparatus for rotation about an axis through a radial plane for trimming vegetation; and a flail stabilizer carried by said apparatus and comprising a flail engaging surface detached from said flail but disposed substantially in a plane at least adjacent said flail for engaging and stabilizing said flail against wobble as said flail rotates relative to said flail stabilizer, said flail engaging surface being sloped from a flail entry end to a flail exit end of said flail engaging surface.

('126 Patent, col. 12, lines 24-25) (emphasis added).

As defendants argue, during the prosecution of this patent, Byrne had to distinguish his invention from prior art by further defining the "slope" from the flail entry to the flail exit:

> Applicant would like to point out that, aside from the fact

---

[6]The court also notes that the accused devices lack the dual function "guide/guard" element of claims 24, 25, 27, 28, 37 and 38, which are written in "means-plus-function" form as permitted by 35 U.S.C. § 112, ¶ 6.  In order to infringe this "means-plus-function" limitation, the accused device must, at a minimum, include some element or means for performing the "dual function" of "guiding said flexible flail means along said reference surface while shielding a user from debris generated by" the flexible flail during use.  It is undisputed that the allegedly infringing feature of the Black & Decker trimmers - - the open wire edge piece - - is incapable of shielding the user from debris generated by the flail as it trims or edges.

that Villani is nonanalogous to flexible flail trimmers and is therefore inapplicable to the claims presented, surface 66 of flange 50 [in the prior art] is not sloped in the manner claimed in the present application. **The slope of surface 66 is in a <u>radial</u> direction and not in the direction claimed herein which is in the direction of the movement or rotation of a flexible flail, i.e., in a <u>circumferential</u> direction.**

(bold added; underlining in original). In other words, during prosecution plaintiff limited the claim language "slope" to mean a slope beginning at the point where the flail first encounters the stabilizing surface and thereafter going downward until the point where the flail departs from the stabilizing surface.

While plaintiff argues that it is not clear that this "circumferential" qualifier was meant to apply to all claims of the '126 patent, defendant correctly notes that the Federal Circuit has held that, absent qualifying language, such remarks made during prosecution to obtain the allowance of a claim apply to all claims in the patent. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998).

Indeed, Byrne conceded this limitation during his deposition:

Q.   And when your patent uses the term sloped from flail entry end to flail exit end, you're talking about a slope in the circumferential direction, correct, not radial?

A.   Yes.

Q.   Is that right?

A.   Correct.

(Byrne Depo. at 191) Byrne further admitted that the section of the accused wire edge guides that he identified as the "stabilizing

13

surface" does not have the claimed slope limitation. (Byrne Depo. at 191, 194-95)

Therefore, because the accused devices lack an essential element of the asserted claims of the '126 patent, summary judgment in defendants' favor on those claims is also appropriate.

Therefore, having heard the parties, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that: (1) defendants' motion for summary judgment on the issue of noninfringement (Doc. #22) be, and is hereby, **GRANTED**; (2) defendants' motion for summary judgment on laches (Doc. #15) be, and is hereby, **DENIED AS MOOT**; and (3) the motion for P. Andrew Blatt to appear pro hac vice (Doc. #36) be, and is hereby, **GRANTED**.

A separate judgment shall enter concurrently herewith.

This 27th day of April, 2006.

TIC: 37 min.



**Signed By:**

***William O. Bertelsman*** *WOB*

**United States District Judge**

14